THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRIAN PEREZ and JENNIFER PEREZ :
:
      Plaintiffs, :
      v. :    **3:12-CV-01322**
:    **(JUDGE MARIANI)**
GREAT WOLF LODGE :
OF THE POCONOS LLC, and :
GREAT WOLF RESORTS, INC. :
:
      Defendants. :

## MEMORANDUM OPINION

Presently before the Court is Defendants Great Wolf Lodge of the Poconos, LLC ("Great

Wolf Lodge") and Great Wolf Resorts, Inc. ("Great Wolf Resorts") Motion for Summary

Judgment. (Doc. 147). For the reasons that follow, Defendants' motion will be denied.

## I.   INTRODUCTION AND PROCEDURAL HISTORY

On July 9, 2012, Plaintiffs filed a Complaint against Defendants, (Doc. 1), and moved to

amend the Complaint on October 8, 2013. (Doc. 37). After a series of highly contentious

discovery disputes, Defendants filed their first motion for summary judgment on February

13, 2014. (Doc. 66). Thereafter, the Court referred all pending motions to Magistrate Judge

Carlson. On June 16, 2015, Magistrate Judge Carlson issued a Report &

Recommendation, recommending that this Court grant Plaintiffs' Motion to Amend and order

Defendants to withdraw and re-file their motion for summary judgment. (Doc. 135). The

Court adopted Magistrate Judge Carlson's Report & Recommendation in its entirety on July 2, 2015. (Doc. 137).

Plaintiffs filed an Amended Complaint on July 6, 2015. (Doc. 139). The Amended Complaint asserts two counts of negligence: one count on behalf of Brian Perez, (*Id.* at ¶¶ 30-51), and one count on behalf of Jennifer Perez. (*Id.* at ¶¶ 52-54). Defendants filed an Answer to the Amended Complaint on August 8, 2015, (Doc. 140), and on September 30, 2015, Defendants filed the Motion for Summary Judgment now pending before the Court. (Doc. 147).

## II.    STATEMENT OF UNDISPUTED FACTS[1]

### A. Background

In 2005, Great Wolf Lodge opened to the public. (Doc. 145, at ¶ 1). Four years later, in 2009, the installation of a waterslide called the Double Barrel Drop (the "DBD") was first discussed during Great Wolf Lodge's budgeting process. (*Id.*, at ¶ 2). The DBD was

---

[1] The Court has considered Defendants' Motion to Strike and Objections to Plaintiffs' Response to Statement of Material Facts in Support of Motion for Summary Judgment, (Doc. 164), and Plaintiffs' Opposition to Defendants' Motion to Strike. (Doc. 176). After the Court's exhaustive review of Defendants' Motion to Strike, Defendants' Statement of Facts, (Doc. 145), and Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts, (Doc. 151), Defendants' Motion to Strike will be granted in part and denied in part. Any facts identified within Part II of this memorandum opinion are those which, after reviewing the parties' submissions, the Court has concluded are undisputed (despite Plaintiffs' evasive denials and failure to comply with Local Rule 56.1).

With respect to the paragraphs that the Court has concluded are undisputed, the remainder of the language in those paragraphs will be stricken as either unresponsive or as improperly containing legal arguments or conclusions. Paragraphs not identified in this section have been determined by the Court to constitute proper denials and will not be stricken. In addition, although the Court does not cite certain paragraphs in this section, it has determined that, based on Plaintiffs' evasive responses, the following paragraphs in Defendants' Statement of Facts are deemed admitted: ¶¶ 28-30, ¶ 52, ¶ 55, ¶ 59, ¶ 74, ¶ 78, ¶¶ 97-100, ¶ 102, ¶¶ 110-111. The remainder of the language in those paragraphs will be stricken. A separate order follows.

designed and manufactured by Proslide Technology Inc., which referred to the DBD as the ProSlide TantrumALLEY CLOVERleaf tubing slide. (*Id.*, at ¶ 5). Great Wolf Lodge subsequently renamed the slide the DBD. (*Id.*, at ¶ 6).

The ASTM International F-24 Committee Standards guide a waterpark operator, and have been adopted in the Commonwealth of Pennsylvania. (*Id.*, at ¶ 4). Prior to the opening of the DBD, testing was performed on the slide by a number of Great Wolf aquatic team members of differing weights and heights. (*Id.*, at ¶ 11). The testing was supervised by ProSlide. (*Id.*). Allen Grimes of ProSlide testified that the typical break-in period of a new waterside is a few weeks. (*Id.*, at ¶ 13). He further testified that, consistent with the ProSlide Operations Manual, most new waterslides utilizing vehicles will experience increased velocity with use during the break-in period. (*Id.*).

Prior to its opening, the DBD was inspected and approved by the Commonwealth of Pennsylvania, Pennsylvania Department of Agriculture, Amusement Ride Safety Program. (*Id.*, at ¶¶ 14, 25). The Operations Manual for the DBD, published by ProSlide on January 27, 2009, sets forth the following: "guests ride the ProSlide **TantrumALLEY** using quadruple **CLOVERleaf** Tube[s]. Each **CLOVERleaf** Tube may accommodate two, three or four riders with a maximum cumulative weight of 700 pounds on the quadruple tube. **\*Please note: ONLY Z-PRO manufactured CLOVERleaf Tubes are recommended for this slide.**" (*Id.*, at ¶ 15). During the commissioning process, however, the weight limitation for the DBD was set at 600 pounds. (*Id.*, at ¶ 16). Despite the revised 600 pound weight

3

limit in place at the time of opening through the time of Mr. Perez's injury, the signage at

Great Wolf Lodge reflected a weight limit of 700 pounds for riders on the DBD. (Id., at ¶

17). It is the responsibility of Great Wolf Lodge attendants to ask guests whether they meet

the weight requirement, and to gauge the guests' cumulative weight to ensure that they do

not exceed the 600 pound operational weight limit for the DBD. (Id., at ¶ 18).

The DBD opened to Great Wolf Lodge guests on March 28, 2010. (Id., at ¶ 14). As

noted, the Commonwealth of Pennsylvania had approved the DBD prior to the opening.

(Id., at ¶ 25). The DBD starts as an enclosed waterslide flume, which enters a funnel where

guests experience a number of oscillations before exiting at a narrow end of the funnel,

back into an enclosed or open flume, into another funnel and finally into a ProSplash runout.

(Id., at ¶ 31). The CLOVERleaf four person vehicle utilized on the DBD indicates:

Quadruple riders will be placed such that the heavier two of the four riders are sitting opposite each other. The remaining two riders may sit in each of the other two positions available . . .

The guests should step into the start section beside their tube, turn, sit into the tube and swing their legs toward the center of the tube, while firmly grasping the handles. Guests are to remain in their tubes at all times, while continuing to firmly grasp the handles until they have exited the **TantrumALLEY** and have decelerated safely into the ProSplash runout.

(Id., at ¶ 32). According to Great Wolf Lodge's 2010 Aquatics Director, when a guest is "in

the correct seating posture, sitting upright holding on to the handles, injury cannot occur."

(Id., at ¶ 26).

4

After an individual is hired to work at Great Wolf Lodge, in addition to the requirement of

being a certified lifeguard, Great Wolf Lodge's aquatic's team provides *Ride Ops* training to

its aquatic team members. (*Id.*, at ¶ 41). Ellis & Associates, an outside aquatics risk

management company, provides additional training for the lifeguards. (*Id.*). In addition to

the training received upon hire, attendants receive daily in-service training prior to each shift

and are required to have additional hours per month of training. (*Id.*, at ¶ 45).

At the time of Mr. Perez's accident, December 12, 2010, the DBD signage (both at the

bottom of the stairway leading to the slide and the top of the stairway), read as follows:

- Pool Depth — 1 foot 6 inches (.46 meters).
- This is a high-thrill ride. Riders will experience steep declines, inclines, changing directions, and high speeds. Guests who are uncertain how they will react to a high-speed, jostling thrill ride should not participate.
- Riders will experience special lighting effects. Persons sensitive to bright or flashing light should not ride.
- Maximum Rider Weight
    - o 1 Rider: Not Allowed.
    - o 2, 3, or 4 riders: 700 lbs. combined
- Minimum Rider Height — 48 inches tall.
- Riders should have the ability to remain in an upright, seated position, and grasp handles.
- Footwear is not permitted.
- Secure loose articles prior to riding.
- Lap riding is not allowed.
- Remain seated in the hole, feet in the middle. Hold handles throughout ride.
- Stopping, changing positions, and forming chains are not permitted.
- Riders must exit immediately after coming to a stop.

Failure to abide by these rules may result in injury to yourself and others and could result in
removal from the waterpark.

(Id., at ¶¶ 62-63). According to Joseph Filoromo, Supervisor for the Amusement Ride Safety Program in Pennsylvania, this signage met ASTM standards. (Id., at ¶ 65).

## B. The Incident

On December 12, 2010, Mr. Perez along with Daniel Conklin, Christopher Beitz, and Augusto LaTorre rode the DBD together utilizing a CLOVERleaf four person vehicle.[2] Mr. Perez has no recollection of seeing any signage at the Great Wolf Lodge waterpark. (Id., at ¶ 59). His companions on the DBD ride at issue, Daniel Conklin and Christopher Beitz, testified to not seeing or reading any DBD signage at the waterpark. (Id.). Augusto LaTorre, also a passenger on the ride with Mr. Perez, testified that while he noticed signage for the DBD at the waterpark, he did not read the sign. (Id.).

Mr. Conklin testified that when he, Mr. Perez, Mr. Beitz, and Mr. LaTorre went to the top of the landing area of the DBD, the attendant on duty, Michael Grey, said nothing to the group, nor did they say anything to Mr. Grey. (Id., at ¶ 75). Mr. Beitz testified that he had no interaction with the lifeguard/attendant at the dispatch point of the DBD, and he had no knowledge regarding the maximum weight limit for the DBD. (Id., at ¶ 83). This testimony is in conflict with the testimony of Mr. Grey and Ian Carmona, another attendant working on the DBD on December 12, 2010. (Id.). The combined weight of Mr. Conklin, Mr. Perez, Mr.

---

[2] Mr. Conklin and Mr. LaTorre testified that on the date of the accident, they rode the DBD one time prior to the ride at issue with Mr. Perez. (Id., at ¶¶ 72, 89). Neither voiced any complaints about the DBD prior to the incident at issue. (Id.). Mr. Beitz testified that the ride at issue was "a little faster" than it was earlier when he rode with Mr. Perez and his daughter and her friend. (Id., at ¶ 84).

6

Beitz, and Mr. LaTorre is disputed by the parties. What is undisputed, however, is that their combined weight was in excess of the DBD's weight limitation.

At some point during the ride, Mr. Perez was separated from the tube and his face/neck struck the slide. Mr. Beitz and Mr. LaTorre testified that as the vehicle entered the second barrel they oscillated to the left side. (*Id.*, at ¶ 67). Mr. Beitz testified that Mr. Perez separated from the vehicle as soon as the raft went up the wall, (*Id.*, at ¶ 68), whereas Mr. LaTorre testified that Mr. Perez separated from the vehicle at the top of the wall. (*Id.*, at ¶ 69). Mr. Conlkin described the incident as "he just flew out of the ride." (*Id.*, at ¶ 80). Mr. Perez maintains that he has no recollection of the DBD ride in which he sustained the injury. (*Id.*, at ¶ 70).

The parties dispute what caused Mr. Perez's to be separated from the vehicle—whether it was the alleged failure of Defendants to enforce the weight limitations, among other potential causes, or whether it was Mr. Perez's failure to follow instructions and to hold on to the handles during the duration of the ride. Both Mr. Beitz and Mr. Conklin testified that they know from common sense to hold onto the handles and that they did so. (*Id.*, at ¶¶ 77, 87). Mr. Conklin further stated that he did not see Mr. Perez at all times during the ride at issue, (*Id.*, at ¶ 78), but noted that the lighting within the DBD "was pretty lit up." (*Id.*, at ¶ 79). Chris Shillcutt, Great Wolf Lodge's Aquatics Director, testified that if guests are seated correctly in the hole of the CLOVERleaf tube and holding onto the handles, there should be no problem on the DBD. (*Id.*, at ¶ 103). Mr. Grimes, the ProSlide representative, testified

7

that in regard to the path followed by the riders, that rider conduct would absolutely affect the ride path. (*Id.*, at ¶ 104). Moreover, Adam Jones, an Aquatics Director at Great Wolf Lodge, has stated that the inherent dangers of the DBD are found in guests' letting go of the handles of the vehicles; guests not maintaining proper riding posture during the ride experience; riders being faced with gravitational forces from all sides during the rides; and guests not heeding the verbal instructions from the ride attendant or the multiple written instructions found within the waterpark and throughout the property. (*Id.*, at ¶ 105).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). A "material fact" is one which might affect the outcome of the litigation under the applicable law. *Boykin v. Bloomsburg Uni. of Pennsylvania*, 893 F. Supp. 378, 393 (M.D. Pa. 1995). A dispute about a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

8

Once the party moving for summary judgment demonstrates the absence of a genuine issue as to any material fact, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. Anderson, 477 U.S. at 248.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007). If a party has carried its burden under the summary judgment rule:

9

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted). "'[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties.'" *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (quoting *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).

## IV. ANALYSIS

Plaintiffs bring a negligence action against the Defendants. "Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 602 Pa. 346, 980 A.2d 502, 506 (2009) (internal citations and quotation marks omitted). Under Pennsylvania law, a Plaintiff bringing a cause of action for negligence must allege "the four basic elements of duty, breach, causation, and damages." *Loughran v. The Phillies*, 888 A.2d 872, 874 (Pa. Super. 2005). "To prevail in a negligence action, a plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage." *Berrier v.*

10

Simplicity Mfg., Inc., 563 F.3d 38, 61 (3d Cir. 2009) (internal citation and quotation marks omitted).

With respect to the elements of Plaintiffs' negligence claim, Defendants' seek summary judgment on the theory that: (1) the application of the "no duty" rule bars Plaintiffs' claim; (2) Plaintiffs' failed to offer sufficient evidence from which a reasonable jury could conclude that Defendants negligence caused Plaintiffs injury; and (3) Plaintiffs' punitive damages claim must be dismissed. Moreover, Great Wolf Resorts maintains that it is an improper Defendant in this action. The Court will first address Defendants' assertion that the no-duty rule bars Plaintiffs' claims.

## A. The No-Duty Rule Does Not Bar Plaintiffs' Cause of Action

"The existence of a duty owed by a defendant is the threshold question in a negligence action, and this is generally a question of law." Perasso v. Caesars Cove Haven, Inc., Civil Action No. 3:10-cv-1476, 2012 WL 2121244, at \*3 (M.D. Pa. June 12, 2012) (citing Holmes v. Kimco Realty Corp., 598 F.3d 115, 118 (3d Cir. 2010)). "Pennsylvania law has long held that the duty a land possessor owes to a person who enters his land is to be determined based on whether the entrant is a trespasser, an invitee, or a licensee." Id. (internal citations omitted). The parties agree that Mr. Perez qualifies as a business invitee, which is "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." Estate of Swift v. Northeastern Hosp. of Philadelphia, 456 Pa. Super. 330, 335, 690 A.2d 719 (Pa. Super.

11

1997). It is well-settled that a business invitee is "entitled to the highest duty of care." *Id.*

Specifically, Section 343 of the Restatement (Second) of Torts, which has been adopted by

Pennsylvania courts, provides that:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965).

Defendants' assert that because of the nature of the activity at issue, riding a "high thrill"

waterslide, it owed no duty to Mr. Perez and therefore his negligence claim must fail as a

matter of law.[3] Under Pennsylvania law, the doctrine of assumption of risk applies, and

therefore "the court may determine that no duty exists, only if reasonable minds could not

disagree that the plaintiff deliberately and with awareness of the specific risks inherent in the

activity nonetheless engaged in the activity that produced his injury. Under those facts, the

court would determine that the defendant, as a matter of law, owed plaintiff no duty of care."

*Howell v. Clyde*, 533 Pa. 151, 162-63, 620 A.2d 1107 (1993). The recent decisions of

Pennsylvania state courts "reflect a reluctance to find assumption of risk applicable unless it

---

[3] As Plaintiffs correctly note, in their motion for summary judgment Defendants "intertwine concepts of assumption of risk based upon the 'no duty' rule for 'known or obvious danger' and the 'no duty' rule based upon inherent/common/frequent/expected risks in recreational activities." (Doc. 152, at 34). The two doctrines, however, are distinct.

is quite clear that the specific risk that occasioned injury was both fully appreciated and voluntarily accepted." Bullman v. Giuntoli, 761 A.2d 566, 571 (Pa. Super. 2000). In order for a plaintiff to "knowingly" or "consciously appreciate" a particular risk, "it is not enough that the plaintiff was generally aware that the activity in which he was engaged had accompanying risk." Barillari v. Ski Shawnee, Inc., 986 F. Supp. 2d 555, 563 (M.D. Pa. 2013) (emphasis in original). Rather, the plaintiff "must be aware of the particular danger from which he is subsequently injured" in order for the Court to conclude that the plaintiff voluntarily assumed the risk as a matter of law. Id. (emphasis in original).

Here, Defendants fail to point to any evidence to support a finding that the risk of a head/neck injury resulting from ejectment from the CLOVERleaf tube was known or obvious to Mr. Perez and, despite Mr. Perez's awareness of that specific risk, he nevertheless voluntarily chose to assume that risk. The report of Plaintiffs' expert, William Avery, disputes Defendants' assertions that what happened to Mr. Perez was a "known" or "obvious" risk of riding a high trill waterslide. (Doc. 153-2). Moreover, Mr. Avery's report faults Defendants' signage for failing to point to the specific risk of complete ejectment from the CLOVERleaf tube and serious injury associated with exceeding the weight and/or person limitations. He further concludes that "[u]nder no imaginable circumstances would what happen to Mr. Perez be within the realm of what was to be expected by a guest on a 'high thrill' waterslide, especially since the waterpark caters to families with young children." (Id.). Because Defendants have offered no evidence from which the Court can conclude

13

that Mr. Perez was subjectively aware of the specific risk of ejectment and resultant head injury, or that these risks were known or obvious, the Court finds that the assumption of risk/no-duty rule does not apply.

The Court further finds that Defendants' additional argument that it did not owe Mr. Perez a duty based on the fact that the injury he complains of is common and inherent in high thrill waterslides, fails as a matter of law. The doctrine Defendants rely on is a "modified version of the assumption of risk doctrine, which has been largely abolished in Pennsylvania." *Loughran*, 888 A.2d at 875. "The no-duty rule applies most prominently in the context of a spectator at a sporting event, such as a fan hit by a foul ball at a baseball game." *Barillari*, 986 F. Supp. 2d at 564. The Pennsylvania Supreme Court, discussing the "no duty" rule as applied to recreational activities, noted that "the 'no duty' rules apply only to risks which are 'common, frequent and expected,' . . . and in no way affects the duty of theaters, amusement parks and sports facilities to protect patrons from foreseeably dangerous conditions not inherent in the amusement activity." *Jones v. Three Rivers Mgmt. Corp.*, 483 Pa. 75, 85, 394 A.2d 546 (1978). The Court further explained that, even if the risk which caused the injury is "inherent" and "common, frequent and expected," a defendant may still owe a duty to the plaintiff, and the plaintiff can recover in negligence, if he or she can "demonstrate deviation from established custom." *Id.* at 85-86; *see also Telega v. Security Bureau, Inc.*, 719 A.2d 372, 376-77 (Pa. Super. 1998) ("Although an operator of an amusement facility for which admissions is charged is not an insurer of his

patrons, he will be 'liable for injuries to his patrons . . . where he fails to use reasonable care in the construction, maintenance, and management of [the facility], *having regard to the character of the exhibitions given and the customary conduct of the patrons invited.*") (quoting *Jones*, 394 A.2d at 549) (emphasis in original). Moreover, "[t]he mere fact one engages in activity that has some inherent danger does not mean that one cannot recover from a negligent party when injury is subsequently sustained." *Bullman*, 761 A.2d at 572.

In the instant matter, the Court finds that the no-duty rule has no application on the facts alleged. *See Telega*, 719 A.2d at 376 ("[T]he no-duty rule applies only when the occurrence which caused the injury is inherent in the activity . . . all other risks which may be present in the amusement facility are governed by the ordinary rules of negligence.") The cases cited by Defendants applying the "no duty" rule concern injuries that occurred during spectator sports such as baseball, not on rides at amusement parks.[4] In addition, Judge Conaboy, in concluding that the "no duty" rule did not apply to an individual injured on a particular amusement park ride when his arm was caught between passenger cars, noted that:

It seems obvious to this Court that, while the risk of being hit by a batted ball at a baseball game is one that can be fairly described as 'common, frequent and expected', such is not the case with amusement style rides like the one in this case. Patrons of rides like 'Fright Night' cannot be expected to anticipate, as a matter of law, that they run

---

[4] The one case relied on by Defendant occurring at an amusement park, *Wood v. Conneaut Lake Park, Inc.*, 417 Pa. 58, 209 A.2d 268 (Pa. Sup. 1965), is inapposite. First, the case is over fifty years old and was decided before *Jones*, the seminal case on the "no duty" rule. Second, the Court did not conclude that the no-duty rule applied to bar the Plaintiffs recovery. Rather, the Court found that the Plaintiff "because of the lack of definiteness, positiveness and certainty in the testimony of his expert, failed to satisfy his burden of proving defendant's negligence, and for this reason judgment non obstante veredicto must be entered in favor of the defendant." *Id.* at 64.

15

the risk of mangling an arm during the course of the ride. Such a result is hardly anticipated by a patron who purchases a ticket for an amusement ride. This is more particularly so in the context of the instant case in which the warning to keep ones body parts within the carriage, even if it was properly displayed on the date of C.S.'s injury, also permitted persons as short as forty two inches to ride unaccompanied by an adult. . . . Defendant's appreciation of foreseeability that children may react in an unpredictable manner combined with the fact that the risk of injury on an amusement ride is not 'common or expected' (as envisioned in *Jones*), precludes application of the 'no-duty' rule as a bar to recovery in this case and creates a jury question as to whether Defendant should have taken additional measures to protect its patrons.

*Sheerer v. W.G. Wade Shows, Inc.*, No. 3:11-CV-1496, 2012 WL 5905039, at *2 (M.D. Pa.

Nov. 26, 2012).

The same logic applies here, and the Court concludes that the "no duty" rule has no application because there is no evidence to establish that the risk of complete ejectment from the CLOVERleaf tube and striking one's head on the slide was "inherent," "common, frequent, or expected" for users of the DBD waterslide. *Id.* The fact that Mr. Perez "sought out an exhilarating high-thrill ride at least twice prior to the ride at issue" and Defendants' reference to signage portraying the DBD as a "high thrill" ride does not establish, as a matter of law, that the risk of Mr. Perez's injury was common or inherent in the activity. Moreover, the fact that a particular injury "happened before" or that a particular individual has "prior knowledge of the risk of injury" does not make a risk customary or an "inherent part" of a particular activity. Simply put, the risk of complete ejectment from the CLOVERleaf tube and striking one's head on the fiberglass slide with sufficient force to render an individual unconscious and with apparently severe and life-altering injuries is simply not an inherent, frequent, common, and expected risk of riding a waterslide, even if

that waterside may be considered "high thrill."[5] (Doc. 153-2). Because the Court concludes

that Defendants' argument that the "no duty" rule applies fails as a matter of law, it need not

address Plaintiffs' alternative argument that Defendants' deviated from established custom,

or engaged in reckless conduct, such that the "no duty" cannot apply under the

circumstances.

## B. Causation

Next, Defendants' assert that summary judgment is appropriate because Plaintiffs'

evidence does not support any theory as to why Mr. Perez was separated from his

CLOVERleaf tube while riding the DBD and, therefore, he cannot establish the causation

element of his negligence claim. Plaintiff disputes this claim, noting that: (1) Michael Grey,

an employee and lifeguard at Great Wolf Lodge, admitted that he did not feel he was

adequately trained on how to operate the DBD on the date of the incident; (2) Mr. Grey

further admitted in an email statement that he was at fault; and (3) Plaintiffs have presented

overwhelming causation evidence. Specifically, Plaintiff asserts that there is sufficient

---

[5] In his expert report, Mr. Avery notes that what happened to Mr. Perez was not part of "normal changes in speed and direction" of the DBD, as Defendants assert. Rather, he notes that:

> A guest moving from side to side as part of normal changes in direction is vastly different than a guest being forcibly ejected from the ride as a result of increased momentum and oscillating too high on the wall. The risk of ejectment from a ride caused by excess momentum is not an inherent risk of a waterslide experience and would not be common knowledge to a waterpark guest such as Mr. Perez. If the ride had followed a normal ride path, with normal changes of speed and direction, ejectment of the ride should not occur, even if the guest had let go of the handles. A guest letting go of handles of the raft or not maintaining proper riding posture during the ride is vastly different than a guest who is forced off the ride as a result of excess speed and the positioning of the raft inside the funnel such that the guest cannot hold onto the handles as a result of gravitational force.

(Doc. 153-2).

evidence from which a reasonable jury could find causation based on the Defendants' failure to shut down the DBD, or, alternatively, causation can be found based on a correlation between the combined weight of Mr. Perez's CLOVERleaf tube and his ejectment from the tube.

"The test to establish causation is whether the Defendant's acts or omissions were a 'substantial factor' in bringing about the plaintiff's harm." *Boice ex rel. Rought v. Tyler Memorial Hosp.*, No. 3:CV-06-1709, 2007 WL 2903424, at *6 (M.D. Pa. Sept. 28, 2007) (internal citation and quotation marks omitted). It is well settled that "[t]he determination of whether the conduct of the defendant was a substantial cause or an insignificant cause of plaintiff's harm should not be taken from the jury if the jury may reasonably differ as to whether the conduct of the defendant was a substantial cause or an insignificant cause." *Ford v. Jeffries*, 474 Pa. 588, 595, 379 A.2d 111 (1977).

The Court need not spend long addressing the parties' arguments with respect to causation, as it is clear that what caused Mr. Perez's injury is hotly contested by the parties. Equally clear is that the Plaintiffs have offered sufficient evidence from which a reasonable finder of fact could conclude that the Defendants' acts or omissions were a substantial factor in bringing about the Plaintiffs injuries. Among other evidence, Plaintiffs' expert witnesses testified that the ride should have been shut down based on a number of injuries, and also testified to a causal connection between Mr. Perez's separation from the CLOVERleaf tube and Defendants' conduct—including dispatching the tube in excess of the

weight limitation, poor lighting, inadequate signage, and insufficient handles. (Docs. 151-1, 151-2, 151-3, 151-4). There is no doubt that causation is a factual issue, appropriately resolved by the jury. *See Gonzalez v. Thomas Built Buses, Inc.*, 934 F. Supp. 2d 747, 756 (M.D. Pa. 2013) ("[C]ausation is a question of fact for the jury to determine."). Viewing the evidence in the light most favorable to the Plaintiff, as the Court must at this stage, the Court finds that Plaintiff has pointed to sufficient evidence from which a reasonable factfinder could conclude that Defendants' negligence was a cause of Plaintiffs' claimed injuries.[6]

## C. Great Wolf Resorts is a Proper Defendant

Defendants also seek summary judgment with respect to the claims against Defendant Great Wolf Resorts on the theory that it is an improper defendant. In support of its assertion, Great Wolf Resorts points to cases concerning "alter ego" liability. Plaintiffs, however, note that they do not seek to impose "alter ego" liability on Great Wolf Resorts. Rather, they seek to impose direct liability on the theory that Great Wolf Resorts is

---

[6] Defendants' Supplemental Motion is Limine, (Doc. 126), which seeks to preclude the testimony of Plaintiff's expert witness Thomas P. Lacek, P.E., will be denied without prejudice. Defendants' may re-file the motion, if they so choose, in accordance with the deadlines that will be set by the Court in connection with the forthcoming Pretrial Conference. However, the Court notes that Judge Conaboy has previously concluded that Mr. Lacek qualified as an expert under Federal Rule of Evidence 702. *See Sheerer*, 2012 WL 5905039, at *3-5 ("Mr. Lacek's proposed testimony is, however, obviously calculated to assist the trier of fact and based upon scientific principles. As such, it is relevant to the jury's determination."). Judge Conaboy further found that based upon Mr. Lacek's "educational achievements, work experience, and professional associations . . . he possesses the requisite level of expertise to assist the jury in understanding the nature and cause of the accident in question. To rule otherwise, would frustrate the liberal policy underlying the qualification of experts in the Third Circuit." *Id.*

vicariously liable for the conduct of its employees committed in the scope of their employment.

Under Pennsylvania law, "only a 'master-servant' relationship 'gives rise to vicarious liability for negligence.'" *I.H. ex rel. Litz v. Cnty. of Lehigh*, 610 F.3d 797, 801-02 (3d Cir. 2010) (quoting *Smalich v. Westfall*, 440 Pa. 409, 269 A.2d 476, 481 (1970)). "As a general rule, a master may be held liable for the acts of the servant when those acts are committed during the course of his employment and within the scope of his authority." *Valles v. Albert Einstein Med. Ctr.*, 569 Pa. 542, 551, 805 A.2d 1232 (2002). "When determining whether a master-servant relationship exists, actual control of the manner of work is not essential; rather, it is the right to control which is determinative." *I.H. ex rel. Litz*, 610 F.3d at 802 (internal citation and quotation marks omitted).

In support of its claim that Defendant Great Wolf Resorts is vicariously liable, Plaintiffs points to the testimony of Defendants' Corporate Designee, William Colavito, who testified that the all of the individuals who work at Great Wolf Lodge, such as the Michael Grey who was the lifeguard on duty on the date of the incident, are also employees of Great Wolf Resorts, and that Great Wolf Resorts is identified as the employer on the employee's paychecks. (Doc. 69-33). In addition, Plaintiff notes that Great Wolf Resorts developed the signage for the rides, and established the safety/operating standards for Great Wolf Lodge, including the DBD. (Doc. 69-1). And, as the Defendants readily admit, Great Wolf Resorts "provides oversight" to Great Wolf Lodge. (Doc. 167, at 25). Viewing all the evidence in the

light most favorable to Plaintiff, the Court concludes that Defendant Great Wolf Resorts is an appropriate Defendant in this litigation and may be vicariously liable to Plaintiffs under the circumstances presented.

### D. Plaintiffs' Punitive Damages Claim Survives Summary Judgment

Finally, Defendants seek summary judgment with respect to Plaintiffs' claim for punitive damages. Punitive damages "are not awarded to compensate the plaintiff for her damages, but rather to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Phillips v. Cricket Lighters*, 584 Pa. 179, 190, 883 A.2d 439 (2005). In Pennsylvania, "[p]unitive damages may appropriately be awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." *Id.* at 189 (internal citation and quotation marks omitted). Reckless indifference, "or as it is sometimes referred to, 'wanton misconduct', means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Smith v. Brown*, 283 Pa. Super. 116, 120, 423 A.2d 743 (Pa. Super. 1980) (internal citation and quotation marks omitted). "The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Feld v. Merriam*, 506 Pa. 383, 396, 485 A.2d 742 (1984).

In support of their claim for punitive damages, Plaintiffs point to, among other things, the report of their expert witness, Stephen Wilcox. Mr. Wilcox analyzed Defendants' trending data and concluded that its injury rate of 1 every 4.6 days was more than 500 times the national average for amusement parks and stated that Defendants' conduct was the "most wanton disregard for the safety of patrons that I have ever encountered in my 30 years of investigating accidents." (Doc. 153-3). Based on this testimony, the Court concludes that Plaintiff has set forth sufficient evidence from which a reasonable jury could conclude that Defendants' conduct was sufficiently wanton and reckless such that punitive damages could be imposed under Pennsylvania law. Because there is plainly a factual dispute as to Defendants' state of mind, resolution of Plaintiffs' punitive damages claim is inappropriate on summary judgment.[7]

## V.    CONCLUSION

For the reasons set forth above, Defendants' Motion For Summary Judgment will be denied in its entirety. A separate order follows,

Robert D. Mariani
United States District Judge

---

[7] It is well-settled that expert testimony may be considered in determining whether there is sufficient evidence for the jury to reasonably conclude that the defendant engaged in sufficiently reckless conduct such that punitive damages may be imposed. *See Klinger v. State Farm Mutual Auto. Ins. Co.*, 115 F.3d 230, 235 (3d Cir. 1997). Equally true is that where, as here, a party's state of mind is in dispute, "a court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own state of mind, and assessing credibility is a delicate matter best left to the fact finder." *Metzger v. Osbeck*, 841 F.2d 518, 521 (3d Cir. 1988) (internal citation and quotation marks omitted).